**DOME CONDOMINIUM ASSOCIATION INC., etc., Plaintiff.**

v.

**G. J. GOLDENBERG, Trustee, Defendant.**

**No. 77–2072–Civ–JLK.**

United States District Court, S. D. Florida.

Dec. 16, 1977.

Jeffrey E. Streitfeld, Lauderdale Lakes, Fla., for plaintiff.

Darrey A. Davis, Miami, Fla., for defendant.

## ORDER

JAMES LAWRENCE KING, District Judge.

This cause came on for consideration upon the motion of plaintiff for remand or abstention. The court, having considered the record and having heard oral argument on this matter, finds and concludes that it should abstain.

■ Abstention is a judicially created doctrine which delimits the power of the federal courts in adjudicating controversies otherwise within their jurisdiction. The fountainhead of this doctrine is *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman,* plaintiffs challenged an administrative order issued by a Texas agency as being violative of Texas law and of the Due Process, Equal Protection and Commerce Clauses of the Constitution. The federal trial court enjoined enforcement of the administrative order based on its being inconsistent with state law. The Supreme Court reversed, explaining that

the last word on the meaning of Article 6445 of the Texas Civil Statutes [the law in question], and therefore the last word on the statutory authority of the Railroad Commission in this case belongs neither to us nor to the district court but to the supreme court of Texas. In this situation, a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. . . . The reign of law is hardly promoted if an unnecessary ruling of a federal court is

thus supplanted by a controlling decision of a state court.

312 U.S. at 499–500, 61 S.Ct. at 645.

Underlying the Supreme Court's order of abstention in *Pullman* is an emphasis on comity. Respect for the expertise of a state's judicial system in construing state statutes is evident throughout the majority's opinion. However, another factor is at work therein—the desire to avoid deciding constitutional questions when possible. It is the combination of unresolved state law issues with the presence of a federal constitutional claim which distinguishes *Pullman* from the case *sub judice* for in the present case, this court is confronted solely with novel, albeit critical, state law issues. No federal constitutional issue appears on the face of the complaint or lurks dangerously near in the background.

As a result of this posture, this court must inquire into the rationale underlying the *Pullman* abstention doctrine to determine whether the present situation was meant to be encompassed within. *Pullman*, itself, provides this court with a clue to one of the primary driving forces behind the invocation of the abstention doctrine. Justice Frankfurter, writing for the Court, expressed it as follows:

> Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, whether the policy relates to the enforcement of the criminal law . . . or the final authority of a state court to interpret doubtful regulatory laws of the state. These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority *because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary.*

312 U.S. at 500–01, 61 S.Ct. at 645. (emphasis added)

█ In the case *sub judice,* plaintiff has filed suit in state court on behalf of the unit owners of a particular condominium complex. Defendant has removed the case to this court by way of diversity jurisdiction. Integral to the resolution of this case are several questions of state law which revolve around the interpretation of state statutes heretofore unconstrued by the highest court of the state of Florida. Defendant does not deny that these state law questions are crucial or that the statutes involved will require this court to engage in statutory construction unaided by the opinions of the highest state courts. Defendant argues, instead, that abstention is a doctrine which should not be invoked except in the most unusual circumstances. With that argument this court agrees. However, this court is of the opinion that the present case provides sufficient exigencies to mandate abstention herein.

## I. *The Scope of Comity*:

█ It is well recognized that "comity is a principle of long standing." *Rath Packing Co. v. Becker,* 530 F.2d 1295, 1306 (9th Cir. 1975). Comity entails concern for the functioning of the state and national systems of government within the delicate framework of federalism. As the Supreme Court has noted,

> We live in the jurisdiction of two sovereignties, each having its own system of courts to declare and enforce its laws in common territory. It would be impossible for such courts to fulfill their respective functions without embarrassing conflict unless rules were adopted by them to avoid it. The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws. The situation requires, therefore, not only definite rules fixing the powers of the courts in cases of jurisdiction over the same persons and things in actual litigation, but also a spirit of reciprocal comity and mutual assistance to promote due and orderly procedure.

*Ponzi v. Fessenden,* 258 U.S. 254, 259, 42 S.Ct. 309, 310, 66 L.Ed. 607 (1921).

The arguments in support of comity and mutual respect between the two levels of

government are venerable and legion. However, abstention does not arise within a one-sided environment. The counterbalancing value which federal courts must confront revolves around the importance of their not abdicating the jurisdiction with which they have been endowed.

In the present case, this court derives its power to hear plaintiff's claim through the diversity jurisdiction. Diversity jurisdiction, as a whole, has been under increasing attack as of late. *See,* H. Friendly, "A Legal Prediction: Marching Into the Third Century," 16 *The Judges Journal,* p. 6 (Spring, 1977). Nevertheless, the diminished appeal of diversity jurisdiction as a predicate for federal judicial power is an *improper* consideration in the resolution of an abstention issue. Justice Brennan has cautioned that

> distaste for diversity jurisdiction certainly cannot be reason to license district judges to retreat from their responsibility. . . . Until Congress speaks otherwise, the federal judiciary has no choice but conscientiously to render justice for litigants from different states entitled to have their controversies adjudicated in the federal courts.

*Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 41, 79 S.Ct. 1070, 1079–80, 3 L.Ed.2d 1058 (1959) (dissenting op.)

Thus, this court is constrained to resolve the abstention question before it with the understanding that defendant's position is not diminished by the fact that the predicate for federal jurisdiction herein is removal via diversity jurisdiction. This court must therefore focus its attention on the question of whether in a suit involving novel and uninterpreted state law questions, a federal court should abstain solely because of its desire to avoid impinging upon the sovereignty of the state involved. With minor qualification, this court believes that this question must be answered in the affirmative.

## II. The Meaning of Meredith v. City of Winter Haven:

*Meredith v. City of Winter Haven,* 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943) represents the most important pronouncement against abstention in a situation similar to the one before this court. This case arose in the district court by way of diversity jurisdiction. Petitioners were seeking an injunction against the city to prevent it from calling in its bonds without paying the deferred interest coupons attached thereto.

The Supreme Court noted, as a preliminary matter, that two issues of state law appeared to be crucial to a resolution of the case. However, these issues involved judicial consideration of several state statutes whose interpretations the state's courts had left uncertain, if not in conflict. Significantly, no federal law or constitutional issue was involved on the face of the complaint. The Court was unwilling to grant abstention, stating that

> [t]he diversity jurisdiction was not conferred for the benefit of the federal courts or to serve their convenience. Its purpose was generally to afford to suitors an opportunity in such cases, at their option, to assert their rights in the federal rather than in the state courts. In the absence of some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred, which would in exceptional cases warrant its non-exercise, it has from the first been deemed to be the duty of the federal courts, if their jurisdiction is properly invoked, to decide questions of state law whenever necessary to the rendition of a judgment.

320 U.S. at 234, 64 S.Ct. at 11.

The Court explained that abstention was not warranted merely because answers to state law questions were difficult, uncertain, or not provided by the highest court of the respective state. Something "exceptional" in nature was required in light of the Court's perception of abstention as an "extraordinary" type of remedy.

As of 1943, abstention in the case *sub judice* probably would not have been the remedy of choice. But in 1959, several im-

portant and seemingly conflicting opinions were rendered by the Supreme Court in cases where novel and unresolved state law issues were predominant and federal constitutional issues were not present, thus presenting a factual context quite similar to the one before the Supreme Court in *Meredith* and before this court in the case *sub judice*. The result reached in one of the most important of these cases—*Louisiana Power & Light Co. v. Thibodaux*, 360 U.S. 25, 79 S.Ct. 1073, 3 L.Ed.2d 1058 (1959)—was contrary to that arrived at in *Meredith*. This case is of great interest for present purposes because of the manner in which the Court reconciled these two decisions.

### III. *Limiting the Scope of Meredith:*

The companion case to *Thibodaux* was *County of Allegheny v. Frank Mashuda Company*, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959). *Mashuda* arrived in the district court by way of diversity jurisdiction. The Board of County Commissioners had exercised eminent domain power to secure property which had formerly been in the control of private parties. This action was challenged. The District Court abstained because of its reluctance to interfere in a matter so intimately connected with the "sovereign prerogative." The Supreme Court upheld the Court of Appeals reversal of the decision to abstain.

The Supreme Court was not satisfied that any "exceptional circumstances" were present to justify the invocation of a doctrine which the Court classified as "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." 360 U.S. at 188, 79 S.Ct. at 1063. There was no federal constitutional issue to be avoided by remanding the case to the state courts. Moreover, the Court was not satisfied that the issue of eminent domain was so "mystically involved" with the sovereign prerogative to justify abstention. Noticeably, state law was not alleged to be unsettled. This, and this factor alone, was glaringly absent from *Mashuda*, an eminent domain case where abstention was denied, and present

in *Thibodaux*, a condemnation case where abstention was granted.

On the same day *Mashuda* was decided, the Supreme Court decided *Thibodaux*. The opinion rendered in *Thibodaux* has served as a predicate for abstention in numerous cases since 1959. Its dictates are heightened in importance given the controversy it spawned as a result of its juxtaposition with the opinions delivered in *Meredith* and *Mashuda*.

*See*, generally, P. Kurland, "Toward a Cooperative Judicial Federalism: The Federal Court Abstention Doctrine," 24 F.R.D. 481 (1959).

*Thibodaux*, like its companions, had arrived in federal district court by way of diversity jurisdiction. With *Meredith* in its background, the Court sought to establish several grounds upon which to distinguish the two cases.

First, the Court noted that an eminent domain proceeding was involved in *Thibodaux*. This aspect of the suit was hardly sufficient, in light of *Mashuda*, to support abstention. However, the Court emphasized that it was one important consideration in the determination of the action before the court.

Second, and of greater importance, is the Court's statement that it had "increasingly recognized the wisdom of staying actions in the federal courts pending determination by a state court of decisive issues of state law." 360 U.S. at 27, 79 S.Ct. at 1072. Retreating slightly from this pronouncement, the Court cautioned that the mere difficulty of deciding state law does not justify the relinquishment of federal jurisdiction. This clearly demonstrated the Court's concern over the stature of *Meredith* for *Meredith* was cited by the Court in support of this statement.

The majority, in *Thibodaux*, was clearly disturbed by the shadow of *Meredith*. In fact, a lengthy footnote was devoted to reconciling the two decisions. In it, the Court noted, *inter alia*, that

[t]he issue in *Meredith v. City of Winter Haven* is, of course, decisively different from the issue now before the Court.

Here the issue is whether an experienced district judge, especially conversant with Louisiana law, who, when troubled with the construction which Louisiana courts may give to a Louisiana statute, himself initiates the taking of appropriate measures for securing construction of this doubtful and unsettled statute . . . should be jurisdictionally disabled from seeking the controlling light of the Louisiana Supreme Court.

360 U.S. at 27, n. 2, 79 S.Ct. at 1072. In addition, the Court noted that *Meredith* had arrived in the Supreme Court after the Court of Appeals had dismissed it, unlike the route traveled by *Thibodaux*.

The dissent, in *Thibodaux,* incisively noted that these two grounds were insufficient to distinguish the two cases. In fact, were these grounds to be accepted as the motivating force behind *Thibodaux,* the decision would have been trivial in impact because it would have been limited to factors relating to the procedural posture of the case rather than to its substance.

The dissent would not permit *Thibodaux* to slip by unnoticed. Comprised of Chief Justice Warren and Justices Brennan and Douglas, the dissent was so disturbed by the relationship between *Meredith, Mashuda,* and *Thibodaux,* that they were impelled to render the following retort:

Since the Court suggests no adequate basis of distinction between the two cases [i. e. *Meredith* and *Thibodaux*], it should frankly announce that *Meredith v. City of Winter Haven* is overruled, for no other conclusion is reasonable.

360 U.S. 25, 38, 79 S.Ct. at 1070 (dissenting op.)

The dissent was, however, somewhat hasty in this comment. There was a major difference between *Meredith* and *Thibodaux.* In *Thibodaux,* the Court confronted a lawsuit burdened with something more than difficult state law issues. The unresolved state law issues there centered on the vital state power of eminent domain. Thus, unlike *Mashuda,* where eminent domain was present, unresolved state law issues were also involved. Unlike *Meredith,* where un-

resolved state law issues were present, a vital state power was the focus of the *Thibodaux* controversy. This important ground of distinction would not really surface until later decisions by the Court in which two of the three *Thibodaux* dissenters would *join,* as will be discussed below.

Thus, the key to *Thibodaux* was the presence of critically unsettled state law involving a power essential to the state sovereign prerogative.

*Thibodaux,* despite its somewhat uncertain reasoning, was important because it clearly elucidated the concerns of comity which underlie the doctrine of abstention. Yet, at the same time, the Supreme Court had acknowledged that federal jurisdiction was not to be relinquished lightly. As the Court had explained, the trial court was not dismissing the case before it. Instead, it was seeking to postpone its decision until it could secure an interpretation of the relevant statutes by the highest court of the state. That *Thibodaux* was not a one-sided argument in support of abstention was demonstrated by the Court's concluding admonishment therein:

If for some reason a declaratory judgment is not promptly sought from the state courts and obtained within a reasonable time, the District Court, having retained complete control of the litigation, will doubtless assert it to decide also the question of the meaning of the state statute.

360 U.S. 29, 79 S.Ct. 1073.

The Supreme Court had initiated a major step in the development of the abstention doctrine with its decision in *Thibodaux.* But it had been careful to remind the judiciary that the justification for abstention resided in concern for the respective competence of the state and federal systems of government and the maintenance of harmonious relations between them. Such a justification cut both ways. Thus, deference to the expertise of the state court system would not be permitted to mushroom into a justification for an abdication of authority.

## IV. Post Thibodaux:

The development of the abstention doctrine in the wake of *Thibodaux* was most evident in a decision rendered by the Supreme Court almost ten years later—*Kaiser Steel Corp. v. W. S. Ranch Co.,* 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968). Here too a power vital to the sovereign prerogative of the state—condemnation—was at issue. Once again, the case arose in the federal system under diversity jurisdiction. The primary issue before the Court was whether a state statute authorized the condemnation—an issue which had not been treated by the highest court of the state as of the time of that case. Petitioner admitted to having trespassed on respondent's land in pursuit of water but argued that New Mexico law authorized his intrusion.

The Supreme Court decided in a *per curiam* opinion that the trial court should abstain. Several factors were isolated as critical in reaching this determination. First, water was involved. The Court stated that in an arid state, such as New Mexico, few things could be of more vital concern to the state's government. Second, a construction of the state statute at issue had not been supplied by the state courts as of the time the suit was filed. The Court felt so strongly about the importance of abstention in light of these two circumstances that it held that the court's refusal to abstain was reversible error—especially since an action for declaratory judgment was then pending in the state courts.

*Kaiser* is even more important for its concurring opinion. There, Justices Brennan, Douglas and Marshall—two of whom had dissented in *Thibodaux*—stated their support for abstention in the circumstances therein. At the same time, the concurring Justices expressly noted their intention to adhere to the *Thibodaux* dissent. Such a position, they explained, did not foreclose abstention. Instead, it relegated abstention to those situations in which "exceptional" or "special" circumstances existed. They felt such circumstances were present in *Kaiser:*

The 'special circumstances', as the court states, arise from the fact that '[t]he state law issue which is crucial in this case is one of vital concern in the arid state of New Mexico, where water is one of the most valuable natural resources.'

*Kaiser,* supra, at 595, 88 S.Ct. at 1755 (concurring op.)

Thus, abstention was not precluded automatically in situations where state law was important but unresolved by state courts and no federal issue was entwined. However, abstention would not be recommended unless "special circumstances" were present. This, it appears, was to be the critical label distinguishing *Meredith* from *Thibodaux.*

The many cases which reached the High Court in the period subsequent to *Thibodaux* further established the "special circumstance" concept of abstention within the *Thibodaux* -type context.

The first, *England v. Louisiana Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), was primarily concerned with a litigant's right to present his federal claims to a state court after the federal court had abstained and then to relitigate them in federal court. While this issue is substantially different from the one which confronted the *Thibodaux* Court, the opinion treating it provides a valuable insight into the stature of *Thibodaux* within the abstention context. In the course of reaching its determination of the issue of "relitigation", the Court made note of several more general observations relating to abstention:

Abstention is a judge-fashioned vehicle for according appropriate deference to the 'respective competence of the state and federal court systems.' *Louisiana P. & L. Co. v. Thibodaux . . . . Its recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.* Accordingly, we have on several occasions explicitly recognized that abstention 'does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise.'

375 U.S. at 415–16, 84 S.Ct. at 465. (emphasis added)

The Supreme Court had thereby indicated that abstention, in the *Thibodaux* context, was far from a relinquishment of federal jurisdiction. Rather, *Thibodaux*-type abstention was an assertion of the federal judicial desire to develop a cooperative relationship with state courts on the theory that such a relationship, when utilized properly, would produce decisions in the most equitable and expert manner possible. In *Thibodaux*-type abstention, the Supreme Court emphasized, federal courts would still be exerting a supervisory role. The decision to abstain would be based on the judicial concern to more effectively exercise federal jurisdiction. It was thereby characterized as an extension of the federal jurisdiction, not an abdication thereof.

The development of *Thibodaux* as a natural outgrowth of federal jurisdiction rather than a betrayal thereof was further reinforced by *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). This case, like *England,* did not center upon the issues focussed on in *Thibodaux.* *McGautha* involved several issues of law arising from criminal convictions. However, once again, the court enumerated several points, in passing, which further explore the meaning of *Thibodaux.*

*McGautha,* like several others already discussed, is important for present purposes because of its dissent. Significantly, one of the two dissents in this case was written by two of the three Justices who had dissented in *Thibodaux.* In support of their argument that a vague state statute should not be applied in this criminal case until the state had construed it, the dissent relied on "a closely related proposition . . . derived from a separate line of cases . . . *Louisiana Power & Light Co. v. Thibodaux* . . . [and] *Allegheny County v. Frank Mashuda Co.*"

In the course of explaining this analogy, the dissent queried:

Are the decisions [i. e. *Thibodaux* and *Mashuda*] reconcilable? . . . The question of state law presented in *Thibo-*

*daux* was a broad one having substantial ramifications beyond the lawsuit at hand. Any prejudice against the out-of-state company involved in that case could have been given effect in the state courts only at the cost of a possibly incorrect decision that would have significant adverse effect upon state citizens as well as the particular outsider involved in the suit. In *Mashuda,* on the other hand, decision one way or another would have little or no effect beyond the case in question: any possible state bias against out-of-staters could be given full effect without hampering any significant state policy. *McGautha,* supra, at 261, n. 11, 91 S.Ct. at 1494–95.

Although characterizable as dictum this analysis does provide further insight into the stature of *Thibodaux* within the abstention context. The *Thibodaux* dissenters, now dissenting in *McGautha,* were noting that *Thibodaux* was firmly entrenched within the abstention tradition. In asserting that abstention, in *Thibodaux,* was based upon a clear recognition of the opposing values which comprise the concept of federal diversity jurisdiction, the dissenters more firmly established that *Thibodaux*-type abstention was consistent with the importance of federal courts preserving the jurisdiction delegated to them by Congress.

Diversity jurisdiction is concerned with prejudice to out-of-staters. Thus, if such prejudice is minimized in the situation before a district court and such situation involves unresolved issues of state law which are vital to the state's sovereign prerogative, abstention is mandated. To state it another way,

[t]aken together, then, *Thibodaux* and *Mashuda* may stand for the proposition that the possibility of bias that stands at the foundation of federal diversity jurisdiction may nevertheless be discounted if that bias could be given effect only through a decision that will have inevitable repercussions on a matter of fundamental state policy.

*McGautha,* supra, at 261, n. 11, 91 S.Ct. at 1495 (dissenting op.)

Here, in a dissent written by two of the three harshest critics of abstention in *Thibodaux,* the circumstances embodied by *Thibodaux* were clearly established as being the "exceptional" type which justified abstention.

The third and final case of note in the development of *Thibodaux* abstention is *Lehman v. Schein,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). This was an insider trading suit whose jurisdiction was premised on diversity of citizenship. Choice of law rules were pertinent to the defendant's liability and the district court, pursuant to *Klaxon v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), looked to the law of the state of incorporation in order to determine the extent of the corporate defendant's fiduciary obligations. That state was Florida. However, Florida law was unsettled in this area. The Supreme Court of Florida had not considered the issues involved. The District Court decided the case despite this uncertainty by relying on its own prediction of the probable Florida judicial position on this subject.

The Court of Appeals reversed the District Court because it did not concur in the lower court's prediction of Florida's position as to the state law issue involved. The Supreme Court vacated that decision because it firmly believed that the appellate court should have utilized Florida's special certification procedure, 1A F.S.A. § 25.031. That statute provides for certification to the state supreme court by the United States Supreme Court or by federal courts of appeal of important decisions of state law which lack determinative state interpretations. The court reasoned as follows:

> Here resort to it [certification] would seem particularly appropriate in view of the novelty of the questions and the great unsettlement of Florida law, Florida being a distant state. When federal judges in New York attempt to predict uncertain Florida law, they act, as we have referred to ourselves on this Court in matters of state law, as *'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction.*

*Lehman,* supra, 416 U.S. at 391, 94 S.Ct. at 1744. (emphasis added).

This court does not contend that *Lehman* is factually identical to the case *sub judice.* Moreover, it is clear that the certification procedure is not statutorily available to a federal district court. These distinctions notwithstanding, the advice rendered in *Lehman* is highly pertinent to the present problem before this court.

While this court is not a New York court attempting to treat a subject of Florida law, it is a Florida *federal* court. The laws under which this controversy arises are laws relating to condominiums. They are quite novel within Florida and this court does not profess to possess any greater expertise with regard to their judicial construction than the federal court of another state probably would possess in this regard. In a sense, this court, as to the present issues before it, is an "outsider", as the *Lehman* court so used the word.

▉ Further, abstention is mandated because there are exceptional circumstances in the case *sub judice.* It is agreed that unsettled issues of state law are involved. This, by itself, is insufficient to support abstention. However, in accordance with the dictates of *Thibodaux* and *Kaiser Steel,* supra, this court has endeavored to determine whether the other prerequisite of *Thibodaux*-type abstention is present—that is, whether the unresolved state law issues concern a power which is vital to the state's sovereign prerogative and to its orderly social and economic development. This court finds that this second factor is present herein.

Condominiums are an important part of Florida's economic and social order. The development of laws pertaining to them involves a matter vital to the state's citizenry as a whole. An interpretation of the laws relating to condominiums will have an impact throughout the entire state, thereby minimizing the possibility of local prejudice against out-of-staters. Thus, another of the underlying concerns of *Thibodaux,* as explicated by *McGautha,* would be satisfied. In 1973, the following was written with regard to the impact of condominiums on Florida:

Among the states, Florida has experienced the most phenomenal condominium growth engendered by population increases, concerns for land conservation, and the necessities of modern living. By 1972 approximately 85,000 units had been constructed in Florida at a total value in excess of $1.5 billion. The increased popularity of condominiums, however, has resulted in a concomitant growth of 'flagrant and subtle' abuses by developers. *Through the utilization of statutory loopholes many developers have realized excess profits.*

Notes, "Florida Condominiums Developer Abuses and Securities Law Implications Create a Need for a State Regulatory Agency," 25 *U.Fla.L.Rev.* 350, 351 (Winter 1973) (emphasis added).

The problems that would be presented by ill considered statutory interpretations, albeit unintentional, in light of the present problems which have arisen through the exploitation of statutory loopholes, leads this court to believe that abstention is clearly mandated in the case *sub judice.* As water is so vital to the arid land of New Mexico (see *Kaiser,* supra) so condominiums have become quite influential in the social and economic growth of Florida. The Supreme Court recognized, in *Lehman,* that the costs of outsider decisionmaking can be unconscionably high in a system which provides means for their alleviation. Certification was the chosen means in that case. Yet the Court indicated that the reasoning underlying certification is equally applicable to abstention when certification is not available to the court involved. *Lehman,* supra, 416 U.S. at 390, 94 S.Ct. 1741.

Finally, this court notes that the issue of condominium regulation is so vital to the growth of this state that judicial actions on this subject will affect individuals throughout the state. As a result, a decision rendered herein will not be confined in impact to the present litigants. Rather, it will "have inevitable repercussions on a matter of fundamental state policy." *McGautha,* supra, 402 U.S. at 261, n. 11, 91 S.Ct. at 1495. Thus, the values upon which diversity jurisdiction is predicated will not be unduly disregarded by abstention in the present case.

Abstention, when appropriate, can save judicial time and resources in the long run. It is the appropriate course of action, according to a very recent decision of the Supreme Court,

> where there have been presented difficult questions of state law bearing on public policy problems of substantial public import whose importance transcends the result in the case then at bar. . . . In some cases, however, the state question itself need not be determinative of state policy. *It is enough that exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.*

*Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (emphasis added.)

This is the quandary in which this court finds itself in the case *sub judice.*

■■■■ This court adheres to the principle that abstention is appropriate only in the presence of exceptional circumstances. It is a doctrine which should not be permitted to dilute the authority granted to the federal courts by Congress to adjudicate controversies within their appointed jurisdiction. At the same time, this court adheres to the ideal expounded by Professor Kurland in an article written soon after the landmark decisions in *Thibodaux* and *Mashuda. See,* P. Kurland, *supra.* That ideal, according to Professor Kurland, was the development of a system in which the special expertise of the state and federal judiciaries could be utilized without requiring either to abdicate their jurisdiction. In this regard, he noted:

> [i]t seems to me that if we can only rid ourselves of the notion of contest between the State and federal courts, as well as among State courts; if we can substitute therefore a concept of coopera-

**448**

tive federalism, we can come closer to the constitutional ideal.

P. Kurland, *supra,* 24 F.R.D. 492.

In its attempt to pursue this ideal and upon the authority of *Louisiana Power & Light Co. v. Thibodaux,* supra, this court therefore,

ORDERS and ADJUDGES that it shall abstain in the action presently before it.