Mark SCHEINBERG, M.D. (formerly named herein as John Jones, M.D.), on his own behalf and on behalf of all others similarly situated, Plaintiff,

v.

James C. SMITH, Attorney General of Florida and Michael J. Satz, State Attorney Seventeenth Judicial Circuit, Florida, Defendants.

No. 79–6403–Civ–SMA.

United States District Court, S. D. Florida.

Dec. 13, 1979.

Bruce S. Rogow, Mary Ellen Shoemaker, ACLU Foundation of Florida, Ft. Lauderdale, Fla., Joel Lumer, ACLU Foundation of Florida, Miami, Fla., for plaintiff.

Martin S. Friedman, Asst. Atty. Gen., Tallahassee, Fla., for defendants.

## MEMORANDUM OPINION

ARONOVITZ, District Judge.

"If the right of privacy means anything, it is the right of an *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972).[1] This case requires that the Court inquire as to the scope of this freedom in the context of abortions and, more specifically, as to the degree to which a state can mandate judicial or spousal involvement in a woman's decision whether to terminate her pregnancy.

### Nature of the Case

In June, 1979, the Florida Legislature enacted and the Governor signed into law the "Medical Practice Act" (hereinafter "the Act").[2] This Act contains a section regulating the termination of pregnancies in Florida[3] and makes it a criminal offense to perform or to participate in a pregnancy termination in violation of the requirements set forth in the Act.[4] On July 5, 1979, Dr. Mark Scheinberg, a licensed physician who performs abortions, filed this class action complaint, naming as Defendants JAMES C. SMITH and MICHAEL J. SATZ, the Attorney General of Florida and the State Attorney for the Seventeenth Judicial Circuit of Florida, respectively.[5] Claiming that certain sections of the Act regulating abortions impermissibly abridged the free speech provisions of the First Amendment, the Equal Protection and Due Process clauses of the Fourteenth Amendment to the Federal Constitution, and a woman's fundamental right of privacy in the abortion decision, Plaintiff sought declaratory and injunctive relief.[6]

The particular provisions of the Act Plaintiff challenged were sub-sections 4(a) and 4(b) of Fla.Stat.Ann. § 458.505 (1979) which, in their entirety, provide as follows:

(4) Prior to terminating a pregnancy the physician shall obtain the written informed consent of the pregnant woman or, in the case of a mental incompetent, the written consent of the court-appointed guardian.

(a) If the pregnant woman is under 18 years of age and unmarried, in addition to her written request, the physician shall obtain the written informed consent of a parent, custodian, or legal guardian of

---

1. *See also Carey v. Population Services International*, 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

2. Chapter 79–302, Fla.Stat.Ann. ch. 458, §§ 458.0015 *et seq.* (1979). The Act took effect on July 1, 1979.

3. Fla.Stat.Ann. § 458.505 (1979).

4. Fla.Stat.Ann. § 458.505(9) (1979) provides that "[a]ny person who willfully performs, or participates in, the termination of a pregnancy in violation of the requirements of this section is guilty of a felony of the third degree, punishable as provided in § 775.082, § 775.083 or § 775.084."

5. The action was filed by Plaintiff under a pseudonym: John Jones, M. D. Upon Plaintiff's request, the Court, in an Order dated October 31, 1979, amended the captioning of the case to reflect Plaintiff's true name, Dr. Mark Scheinberg, M. D.

6. Plaintiff asserted jurisdiction under 28 U.S.C. §§ 1331(a) and 1343(3) and sought declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

such unmarried minor, or the physician may rely on an order of the Circuit Court, on petition of the pregnant unmarried minor or another person on her behalf, authorizing, for good cause shown, such termination of pregnancy without the written consent of her parent, custodian, or legal guardian. The cause may be based on a showing that the minor is sufficiently mature to give an informed consent to the procedure, or based on the fact that a parent unreasonably withheld consent by her parent, custodian, or legal guardian, or based on the minor's fear of physical or emotional abuse if her parent, custodian, or legal guardian were requested to consent, or based upon any other good cause shown. At its discretion the court may enter its order ex parte. The court shall determine the best interest of the minor and enter its order in accordance with such determination.

(b) If the woman is married, the husband shall be given notice of the proposed termination of pregnancy and an opportunity to consult with the wife concerning the procedure. The physician may rely on a written statement of the wife that such notice and opportunity has been given, or he may rely on the written consent of the husband to the proposed termination of pregnancy. If the husband and wife are separated or estranged, the provisions of this paragraph for notice or consent shall not be required. The physician may rely upon a written statement from the wife that the husband is voluntarily living apart or estranged from her.

Sub-section 4(a) governs abortions sought by unmarried women under eighteen (18) years of age (hereinafter unmarried minors), requiring that, as a pre-condition to securing an abortion, an unmarried minor provide her physician with either the written informed consent of a parent, custodian, or legal guardian or an order from the Circuit Court. Sub-section 4(b) governs abortions of married women, requiring that a wife who is neither "separated or estranged" furnish her husband with notice of the proposed abortion and allow him the opportunity to consult with her concerning the procedure.

A hearing was held on July 10, 1979, to consider Plaintiff's motion for class action certification and to consider Plaintiff's request for preliminary injunctive relief as to the challenged statutory provisions. In a memorandum opinion dated July 13, 1979, the Court ruled that Plaintiff's cause of action was properly maintainable as a class action and that Plaintiff had the requisite standing to represent the two certified sub-classes.[7]

Further, relying on the Supreme Court's decision in *Bellotti v. Baird*, —— U.S. ——, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the Court preliminarily enjoined Defendants from prosecuting Plaintiff, or any member of the classes he represented, under that portion of the Act governing the performance of abortions on unmarried minors.[8] The Court's rationale was that § 458.-505(4)(a) empowered a Florida circuit court judge to do precisely what the *Bellotti* decision prohibited, that is, to deny an abortion to an unmarried minor, even if adjudged sufficiently mature to give informed consent, where the abortion would not be in her "best interests" as the judge perceived them.

Based upon the record then before it, however, the Court concluded that Plaintiff had not demonstrated that there was a sub-

---

**7.** The sub-classes were defined as follows:

  1) all unmarried, minor pregnant women desiring to terminate their pregnancies, and their physicians; and
  2) all married pregnant women desiring to terminate their pregnancies, and their physicians. ·

Although the Court certified these sub-classes without prejudice to Defendants' right to argue for decertification, Defendants have not availed themselves of this opportunity and, in fact, have stipulated to Plaintiff's standing to maintain this action on behalf of the two certified sub-classes. *See* Bilateral Pretrial Stipulation, ¶ 8(B). Accordingly, the Court affirms its earlier rulings concerning standing and class certification.

**8.** *Jones v. Smith*, 474 F.Supp. 1160, 1164 (S.D. Fla.1979).

stantial likelihood the spousal notice and consultation provision of the Act would be found unconstitutional.[9] Accordingly, preliminary injunctive relief was denied with regard to that portion of the Act.[10]

On September 14, 1979, a final hearing was held on Plaintiff's request for declaratory and permanent injunctive relief as to the two challenged provisions of the Act. The issues before the Court were comprehensively briefed and argued. In addition, the Court heard testimony of numerous witnesses for the Plaintiff, a large number of whom the Court designated as experts. Defendants, in turn, presented the testimony of a single witness, an acknowledged expert in the disciplines of obstetrics and gynecology.

The Court has carefully reviewed and considered the record of the September 14th hearing, as well as the record from the July 10th preliminary injunction proceedings, and herein makes its findings of fact and conclusions of law as required by Fed. R.Civ.P. 52. Based upon this review and for the reasons discussed below, the Court concludes that the challenged provisions of the Act, sub-sections 4(a) and 4(b) of § 458.505, are constitutionally defective in that they impermissibly invade a woman's fundamental right to privacy in the abortion decision.[11]

*Abstention Unwarranted*

The Court must address the preliminary question of whether it should abstain in accordance with the dictates of *Railroad Comm'n v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). For the reasons noted below, the Court finds that *Pullman*-type abstention is inappropriate.

The judicially created doctrine of abstention is "an extraordinary and narrow exception to the duty of a [federal] Court to adjudicate a controversy properly before it."[12] It cannot be invoked "to dismiss a suit merely because a State court could entertain [the action],"[13] nor does the "opportunity to avoid decision of a constitutional question . . . alone justify abstention by a federal court."[14] Rather, "[a]bdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest."[15]

Defendants contend that *Pullman*-type abstention on the unmarried minor portion of this litigation is appropriate[16] because the Florida state courts have not construed § 458.505(4)(a) and because it "is susceptible of a construction . . . 'which might

---

9. The Court stated that it would remain open to a contrary showing at the final hearing in this cause. *Id.*, at 1167.

10. *Id.*, at 1171.

11. The Court feels constrained to emphasize at this point in its opinion that the weight of the September 14th record, particularly the expert testimony, overwhelmingly supported Plaintiff's position on the spousal notice and consultation provision. The same could not be said concerning the record from the July 10th preliminary injunction hearing, which accounts for the Court's otherwise inconsistent finding that Plaintiff had failed to demonstrate a substantial likelihood of prevailing on the notice and consultation issue.

12. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

13. *Alabama Public Service Commission v. Southern Railway Co.*, 341 U.S. 341, 361, 71

S.Ct. 762, 774, 95 L.Ed. 1002 (1951) (Frankfurter, J., concurring).

14. *Colorado River, supra*, 424 U.S. at 815, n. 21, 96 S.Ct. at 1245, n. 21.

15. *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959).

16. It should be noted that the Court gave the Defendants every opportunity to raise and to argue the question of abstention at the July 10, 1979 preliminary injunction hearing. *See* Tr. at 42–43. Defendants failed to do so and it was only on the eve of the September 14, 1979 final hearing that they requested the Court to abstain. This placed the Court in the anomalous posture of having to consider whether or not to abstain after having made a preliminary determination on the merits of the substantive issues present here.

avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.' " [17]   By abstaining, Defendants argue, the Court would further the rationale underlying *Pullman*, that is, to avoid unnecessary federal constitutional challenges to state laws, thus obviating needless friction between the state and federal governments and promoting federal-state court relations (i.e. comity).[18]   Although the Court is in agreement with the general principles of abstention enunciated by the Defendants, it finds itself unable to agree with Defendants' conclusion that abstention is warranted here.

Plaintiff has correctly argued that the hallmark of *Pullman*-type abstention cases is ambiguity in the challenged statute.[19]   As the Court elaborated in its July 13, 1979 opinion, § 458.505(4)(a), on its face, admits of only one reasonable interpretation: it places an impermissible right to veto the informed abortion decision of an unmarried minor in the circuit court.[20] Even if the Court were to accept the alternative construction suggested by Defendants,[21] some of the arguable constitutional

infirmities in § 458.505(4)(a) would remain. Subsection 4(a) does not, for instance, provide procedural safeguards to assure that an unmarried minor can anonymously and expeditiously secure a court order authorizing an abortion.[22]   Furthermore, "the language allowing a judge to enter an order 'based upon any other good cause shown' does not specifically inform the judge that a minor found not to be sufficiently mature to give informed consent must still be given the opportunity to show that an abortion would nevertheless be in her best interest .   .   .  ." [23]

Even assuming state court construction could modify or obviate some of these infirmities, other considerations militate against abstention.  As the 7th Circuit has observed, "[t]he   .   .   .   abstention doctrine is rooted in equity.  Accordingly, in determining whether to abstain, the need for clarification must be balanced against the effects of abstaining." [24]   One such effect is delay, delay which poses substantial risk of harm to the numerous members of the class of unmarried, minor women desir-

17.  *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976).  *See also Central Power & Light Co. v. P. U. C. of Texas*, 592 F.2d 234 (5th Cir. 1979).

18.  *See generally Dome Condominium Association, Inc. v. Goldenberg*, 442 F.Supp. 438 (S.D. Fla.1977).

19.  *See, e. g., Lake Carriers Association v. Mac-Mullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Wynn v. Carey*, 582 F.2d 1375 (7th Cir. 1978).  *See generally* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, *Hart & Wechsler's The Federal Courts and The Federal System* 985–1009 (2d ed. 1973).

20.  In pertinent part, the Court held that it "must agree with the Plaintiff that the statute allows the judge to do precisely what *Bellotti* prohibits, namely, to deny an abortion to a minor who is mature enough to give an informed consent.  While the preceding sentences of the section tell the judge that he *may* find good cause if the minor is sufficiently mature, the final sentence is drafted with mandatory language—'The Court *shall* determine the best interest of the minor and enter its order in accordance with such determination.' The plain reading of the section indicates that the best interest standard overrides any basis

for finding good cause under the criteria set forth in the preceding sentences if the judge determines that an abortion is not in the child's best interests.  Therefore the statute unconstitutionally allows the judge to deny abortions to minors who are sufficiently mature to give informed consent." *Jones v. Smith, supra*, at 1166.

21.  Defendants' alternative construction would require the Florida courts to construe the word "shall" in the last sentence of § 458.505(4)(a) to mean "may", rendering the sentence in question directory rather than mandatory.

22.  *Jones v. Smith, supra*, at 1165, *citing Bellotti v. Baird, supra*, 99 S.Ct. at 3049–50.  The significance of the absence of these procedural safeguards is not abated by Defendants' argument that the Florida Supreme Court is solely empowered to promulgate rules of procedure for the courts.

23.  *Jones v. Smith, supra*, at 1170, *citing Bellotti v. Baird, supra*, 99 S.Ct. at 3049.

24.  *Wynn v. Carey*, 582 F.2d 1375, 1381 (7th Cir. 1978).

ing to terminate their pregnancies.[25] The potential for delay and the attendant risk of harm is exacerbated here because this Court is unable to certify questions of Florida state law to the Florida Supreme Court.[26] This case is therefore significantly different from *Bellotti v. Baird* (Bellotti I),[27] where the Supreme Court directed a District Court to abstain pending construction of an abortion statute certified by the District Court directly to the Supreme Judicial Court of Massachusetts. Finally, it should be noted that Defendants have not requested the Court to abstain on the spousal notice and consultation issue.[28] This raises the troubling spectre of different courts, state and federal, ascertaining the constitutionality of adjacent sub-sections of the same statute. Such piecemeal adjudication, with its attendant possibilities of duplication and irreconcilable results, substantially undercuts the rationale for *Pullman*-type abstention.

In sum, it is the finding of this Court that the minimal benefits which may inure by permitting the Florida state courts to construe § 458.505(4)(a) are outweighed by the adverse consequences of abstaining. Accordingly, Defendants' motion to abstain is denied.

### Unmarried Minors

In accordance with a pre-trial stipulation, counsel for both parties agreed that no evidence would be presented at the September 14th hearing on the unmarried mi-nor issue and that Summary Judgment would be warranted if the Court denied the Defendants' Motion to Abstain. Inasmuch as the Court has denied the Motion to Abstain and since the parties are in agreement that the July 10, 1979 record is complete on the unmarried minor issue, the Court adopts and incorporates herein its opinion and order dated July 13, 1979.[29] For the reasons set forth therein, the Court declares § 458.-505(4)(a) unconstitutional.

### Spousal Notice and Consultation

The evidence adduced at the September 14, 1979 hearing focused upon the constitutional issues raised by § 458.505(4)(b)'s spousal notice and consultation requirement.

Section 458.505(4)(b) seeks to regulate the intrafamial exchange of information on questions relating to childbearing. Specifically, it requires that a married woman, who intends to seek an abortion, give her husband "notice of the proposed termination of pregnancy and an opportunity to consult . . . concerning the procedure." Furthermore, as a precondition to actually securing the abortion, the wife must provide her attending physician with either:

1) a written statement that such notice and opportunity have been given; or
2) the written consent of her husband.

These requirements apply without regard to the point during the gestation period that the abortion would occur; in other words,

---

25. Defendants state that they would consent to the Court's July 13, 1979 preliminary injunctive order remaining in effect during the pendency of any state court proceedings. While this might well diminish the risks posed by this Court abstaining, the Court questions whether it could abstain and, at the same time, allow its injunctive order to remain in effect. The Fifth Circuit has indicated that dismissal without prejudice, rather than a stay, is appropriate in abstention cases. *See Central Power and Light Co. v. P. U. C. of Texas*, 592 F.2d 234, 236 (5th Cir. 1979). Dismissal would require dissolution of the injunction.

26. *See* Rule 9.510, Fla.R.App.P. (certification to the Florida Supreme Court limited to the U.S. Supreme Court or the U.S. Court of Appeals).

27. *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

28. The Court in no way intimates that abstention must be predicated on a request of a party. Clearly, a court may properly abstain *sua sponte*. However, inasmuch as Defendants have not requested abstention on the spousal notice and consultation issue and since § 458.-505(4)(b) is facially clear, the Court finds that abstention is inappropriate on that issue as well.

29. *Jones v. Smith, supra.*

they are equally applicable to first, second or third trimester abortions.[30] If the husband and wife are "separated or estranged", however, the statute contains an express exception rendering the notice requirement inapplicable.

· Plaintiff contends that these requirements violate the Fourteenth Amendment's guarantees of privacy and equal protection, as well as the free speech provisions of the First Amendment. Concerning his reliance on the First Amendment, Plaintiff maintains that the notice and consultation requirement unconstitutionally abridges the right of married women not to be compelled by the state to speak. In short, Plaintiff contends that the state cannot, consistent with the First Amendment, compel a woman to speak against her will, even if the intended audience is limited to her spouse and the subject of such speech concerns a jointly conceived, but yet unborn, child.

With regard to his equal protection contentions, Plaintiff asserts that the notice and consultation requirement is not imposed upon comparable medical procedures which, in terms of their health risks or consequences, are substantially similar. Since the state has failed to advance a "compelling governmental interest" for this differential treatment, Plaintiff argues, the challenged provision runs afoul of the equal protection clause.

Finally, Plaintiff claims that the notice and consultation requirement intrudes upon a woman's fundamental constitutional right of privacy, defined as "the right of the individual . . . to be free of unwarranted governmental intrusion into . . . the decision whether to bear or beget a child."[31] More specifically, Plaintiff challenges § 458.505(4)(b) as impermissibly interfering with the constitutional right of a woman, in consultation with her physician, to decide to terminate her pregnancy during the first trimester and to effectuate that decision.

### The Constitutional Standard

Where, as here, the state seeks to regulate first trimester abortions, several established principles guide the Court in determining whether the regulation is constitutionally permissible. In *Roe v. Wade*,[32] the Supreme Court held that the Fourteenth Amendment's protection of certain aspects of personal privacy includes a guarantee that a woman could decide whether to terminate her pregnancy without unjustified state interference. The Court cautioned, however, that this right "is not unqualified and must be considered against important state interests in regulation."[33] Inasmuch as the woman's right to make an unencumbered decision concerning abortion was derived from the "fundamental right" of privacy, the Court stated that interference with the right may be justified only by a "compelling state interest" and that "legislative enactments must be narrowly drawn to express only the legitimate state interests at stake."[34] The Court went on to say that the state has a valid interest in the mother's health, which becomes compelling after the first trimester of pregnancy, and also a valid interest in the protection of a potential human life, which becomes compelling when the fetus becomes "viable."[35] During the first trimester, however, "the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician,

---

**30.** Whether the statute's failure to distinguish on the basis of trimesters or "viability" would, of itself, raise an arguable constitutional infirmity in light of *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), was neither advanced nor argued to the Court. *See also Roe v. Wade*, 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147.

**31.** *Eisenstadt v. Baird, supra*, 405 U.S. at 453, 92 S.Ct. at 1038.

**32.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**33.** *Id.*, at 153–54, 93 S.Ct. at 727.

**34.** *Id.*, at 155, 93 S.Ct. at 728.

**35.** For the Supreme Court's most recent discussion of the "viability" standard, *see Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).

. . . free of interference by the State." [36]

A number of lower courts have interpreted *Roe* as forbidding all regulation of first trimester abortions.[37] It is now clear, however, that not all such regulation is impermissible. If the challenged regulation does not impinge upon a woman's decision to have a first trimester abortion and does not place obstacles in the path of effectuating that decision, the state need only demonstrate a rational relationship to a legitimate purpose.[38] Even if the regulation does impinge upon a woman's abortion decision or the means of effectuating it, it still "is not unconstitutional unless it unduly burdens the right to seek an abortion." [39] A regulation that unduly burdens the abortion decision must be justified by a compelling interest.[40] On the other hand, a regulation that impinges upon the abortion decision without unduly burdening it will withstand constitutional attack if it reasonably furthers a proper state purpose.[41] Thus, "[a]s *Whalen* [*v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64] (1977) makes clear, the right in *Roe v. Wade* can be understood only by considering both the woman's interest and the nature of the State's interference with it." [42]

With these principles in mind, the Court must determine the degree that § 458.-505(4)(b) interferes with a woman's consti-tutional right to choose to terminate her pregnancy during the first trimester. The Court must weigh that interference against the interests allegedly furthered by the spousal notice and consultation requirement and then assure itself that the state does not have alternative, less obtrusive means by which it can effectuate those interests.

### A.

The testimony adduced at the September 14, 1979 hearing underscored that in many, if not most, cases the decision to seek an abortion is a joint decision by husband and wife. In these cases, the husband and wife have voluntarily chosen to consult about the decision.

Similarly, the testimony revealed that experts from the disciplines of psychiatry, gynecology, psychology and obstetrics, as well as counselors and social workers, uniformly encourage married couples to consult on particularly important decisions such as whether to terminate a pregnancy. By definition, a good or sound relationship is one in which mutual communication on sensitive and difficult topics like sex, childbirth and abortion is commonplace.

Unfortunately, not all marital relationships are predicated on such mutual communication and decisionmaking. Uncontro-

36. *Roe v. Wade, supra*, 410 U.S. at 164, 163, 93 S.Ct. at 732.

37. *See, e. g., Friendship Medical Center v. Chicago Bd. of Health*, 505 F.2d 1141, 1148–52 (7th Cir. 1974), *cert. denied*, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

38. *See Maher v. Roe*, 432 U.S. 464, 478–80, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (upholding Connecticut welfare regulations that fund childbirth but do not pay for an abortion unless a physician certifies the abortion is "medically necessary"); *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (Connecticut criminal statute proscribing unlicensed physician from performing abortions does not impinge on abortion decision).

39. *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976).

40. *See Carey v. Population Services International*, 431 U.S. 678, 686, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. 705. *Compare Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (striking down statute requiring that abortions be performed only in accredited hospitals and that three-doctor committee approve all abortions) *with Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (striking down state law limiting salene amneocentesis method of abortion, requiring spousal consent, and requiring parental consent for minors).

41. *See Planned Parenthood v. Danforth, supra* (upholding regulation imposing recordkeeping requirements as related to state purpose of furthering public health).

42. *Maher v. Roe, supra*, 432 U.S. at 473, 97 S.Ct. at 2382.

verted testimony by Doctors Haber,[43] Good [44] and Seiden [45] and Ms. Radziwill [46] established that in a substantial number of marriages, a pregnant wife is unwilling, even unable, to discuss the abortion decision with her husband. The testimony revealed there may be any number of reasons for this reluctance. Often a wife fears that her husband will respond with physical or emotional abuse. In other cases, she fears that the marriage itself may be jeopardized.

Specific instances where a woman might desire or choose not to communicate with her husband concerning an impending termination of pregnancy include:

1) where the husband is not the father of the fetus; for instance, where the fetus is the product of an extramarital affair;

2) where the wife has been a rape victim, has not disclosed the incident to her husband, and has subsequently become pregnant;

3) where the husband, because of strong religious or moral precepts, would strenuously object; [47]

4) where the husband is seriously ill or emotionally unstable and is unable to participate in any abortion decision; [48] and

5) where the woman is a "battered wife" and fears that discussion concerning an abortion may precipitate physical violence.

Dr. Good also testified as to what he termed "skewed relationships." In such marriages, which Dr. Good characterized as not uncommon, the power of the husband is so overwhelming that he will, if consulted, obstruct, or altogether prevent, a woman

from freely deciding to secure an abortion. To obviate this possibility, Dr. Good testified, many women in these relationships consciously choose not to consult with their spouse.

The testimony further indicated that in instances like those outlined above, the requirement of compulsory notification and consultation will, at the least, produce anxiety and stress for the woman and her marriage. Moreover, where a woman is forced to notify and consult with her husband against her will in order to obtain a legal abortion, she may choose less desirable alternatives. She may delay seeking an abortion, self-abort, or secure an illegal abortion, thereby risking serious, perhaps irreversible consequences.

■ Based upon the foregoing, the Court concludes that the record from the September 14, 1979 hearing supports a finding that mandatory spousal notice and consultation, with only a limited exception for "separated or estranged" couples, *places an undue burden* on the right of a substantial number of pregnant women to decide to terminate their pregnancies.[49]

### B.

Defendants seek to justify this burden, arguing that the spousal notice and consultation requirement furthers two "compelling" interests:

1) the state's interest in promoting the marital relationship; and,

43. Dr. Haber, a practicing clinical psychologist, was designated an expert by the Court, based upon her education (Ph.D.) and clinical experience.

44. Dr. Good (M.D.), is one of four doctors in the United States qualified to practice in both Obstetrics/Gynecology and Psychiatry.

45. Dr. Seiden is a practicing Psychiatrist affiliated with Cook County General Hospital in Chicago, Illinois.

46. Ms. Radziwill is affiliated with the University of Miami Medical School and its Department of Obstetrics/Gynecology/Family Services. In her capacity as a counselor, Ms. Radziwill consults with approximately one thousand patients per year who are considering terminating their pregnancies.

47. The testimony of anonymous witness # 1 established such an instance.

48. The testimony of anonymous witness # 2 established such an instance.

49. *Cf. Stewart v. Cohen*, Civil No. 79–162P (D. Mne. Sept. 13, 1979) (concluding that mandatory parental notification statute unduly burdened a woman's abortion decision).

2) the husband's interest in the procreative potential of the marriage.[50]

Indeed, both interests are significant. In *Planned Parenthood v. Danforth, supra,* the Supreme Court explicitly recognized the legitimacy of a husband's interest in his wife's pregnancy, the state's interest in protecting the marital relationship and the potential impact of an abortion decision on that relationship:

> We are not unaware of the deep and proper concern and interest that a devoted and protective husband has in his wife's pregnancy and in the growth and development of the fetus she is carrying. Neither has this Court failed to appreciate the importance of the marital relationship in our society. See, *e. g., Griswold v. Connecticut,* 381 U.S. 479, 486 [85 S.Ct. 1678, 1682, 14 L.Ed.2d 510] (1965); .  .  .. Moreover, we recognize that the decision whether to undergo or to forego an abortion may have profound effects on the future of any marriage, effects that are both physical and mental, and possibly deleterious.[51]

Notwithstanding the significance of these interests, the Court in *Danforth* and the Fifth Circuit in *Poe v. Gerstein,*[52] found them insufficiently compelling to justify allowing a husband to have an absolute, unilateral veto over the wife's abortion decision. However, neither *Danforth* nor *Poe* considered whether less intrusive measures designed to insure a husband's participation in the abortion decision could, within constitutional contours, be predicated on these interests.

■ Defendants' reliance upon *Poe* in its effort to elevate a husband's procreative potential in a marriage to a "compelling" interest is misplaced. As *Poe* points out, *Skinner v. Oklahoma,*[53] the seminal case on the fundamentality of procreational rights, "did not guarantee the individual a procreative opportunity, it merely safeguarded *his* procreative potential from state infringement" by sterilization (emphasis supplied).[54] Since abortion poses no physical threat to a man's personal ability to procreate, there is no fundamental constitutional interest which is safeguarded by the notification and consultation requirement.

■ The most Defendants can glean from *Poe* is recognition of the husband's "strong interest"[55] in the potential for having children with his wife.[56] Where, as here, a statute imposes an undue burden upon a woman's constitutional right to choose to terminate her pregnancy, a "strong" countervailing interest is insufficient justification.

■ Moreover, the Court questions whether the notice and consultation requirement furthers a husband's interest in the procreative potential of his marriage. The parties presented conflicting expert testimony concerning whether a first trimester abortion creates a substantial risk of loss of fertility in women. However, the testimony uniformly reflected that the consultation requirement might result in weeks of delay which, in turn, might substantially increase the risk of diminished marital pro-

50. The Court is not unmindful that the Florida Legislature, in enacting § 458.505(4)(b), may have intended to further other interests which Defendants have not asserted (e. g. safeguard health, maintaining medical standards). Based upon a review of the available legislative history and subject to the discussion in *fn.* 56, *infra,* the Court has been unable to discern any other arguably compelling justification for the statute insofar as it applies to first trimester abortions.

51. 428 U.S. at 69–70, 96 S.Ct. at 2841.

52. 517 F.2d 787 (5th Cir. 1975).

53. 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

54. 517 F.2d at 797.

55. 517 F.2d at 796.

56. *Poe* also suggested that a father has a strong interest in a fetus which he sired. It should be noted that § 458.505(4)(b) is not drawn with sufficient particularity to protect that interest. The statute is both underinclusive because it does not require notice to fathers who are not a married woman's spouse and overinclusive because it does require notice to a woman's spouse without regard to whether he sired the fetus she bears.

creative potential. Similarly, it should be noted that § 458.505(4)(b), at least in regard to the objective of preserving marital procreative potential, is grossly underinclusive because it does not require that a married woman notify and consult with her husband about an impending hysterectomy or tubal ligation—operations which altogether foreclose marital procreative potential according to expert testimony.

■ Whether the remaining interest asserted by Defendants would be sufficiently "compelling" to justify the unduly burdensome nature of § 458.505(4)(b) need not be decided. As laudable as the state's goal of furthering the marital relationship may be, the Court seriously questions whether the mandatory spousal notice and consultation requirement does so and, even assuming it does in a generalized way, § 458.505(4)(b) is not drawn with sufficient particularity "to express *only* the legitimate state [interest] at stake."[57]

Most notably, the statute makes no exception for a married woman carrying the child of someone other than her husband (notice is predicated upon husbandry rather than fatherhood). As the uncontroverted expert testimony emphasized, compelling a wife to disclose this fact against her will is a perverse way of promoting marital harmony. Thus, insofar as the statute seeks to promote marital harmony it is overinclusive because it includes husbands who may not have sired the fetus; in short, it "sweeps too broadly."[58]

■ For the reasons elaborated above, the Court finds that Defendants have failed to justify the unduly burdensome nature of § 458.505(4)(b) insofar as it applies to first trimester abortions. The Court emphasizes that it does not hold mandatory spousal notice and consultation *per se* unconstitutional.[59] As presently drafted, however, § 458.505(4)(b) fails to conform to constitutional limitations.

### Conclusion

Based upon the foregoing and pursuant to 28 U.S.C. § 2201, the Court declares sub-sections 4(a) and 4(b) of § 458.505 unconstitutional.[60] The preliminary injunction previously entered in this action is hereby dissolved. The Court finds it unnecessary to rule on Plaintiff's Motion for Permanent Injunctive Relief, for there is "no allegation here and no proof that [Defendants] would not, nor can [the Court] assume that they will not, acquiesce in [and abide by the Court's] . . . holding."[61] It is the Court's expectation that Defendants and other prosecutorial authorities in the state will give full credence to this decision that §§ 458.505(4)(a) and (b) are unconstitutional. Final Judgment shall hereafter be entered in accordance with this opinion.

**57.** *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 728.

**58.** *See Charles, et al. v. Carey*, Civil No. 79C–4541 (N.D.Ill. Nov. 16, 1979) (preliminarily enjoining an Illinois spousal notice requirement for similar reasons).

**59.** *Cf. Bellotti v. Baird*, 99 S.Ct. at 3050, (requiring that an unmarried minor have the option to seek a court order authorizing an abortion without first consulting or notifying her parents).

**60.** In view of the Court's disposition of this case, Plaintiff's other constitutional claims need not be addressed. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**61.** *Poe v. Gerstein*, 417 U.S. 281, 281, 94 S.Ct. 2247, 2248, 41 L.Ed.2d 70, *quoting from Douglas v. City of Jeannette*, 319 U.S. 157, 165, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). *See also Roe v. Wade, supra*, 410 U.S. at 166, 93 S.Ct. 705; *Women's Medical Ctr. of Providence, Inc. v. Cannon*, 463 F.Supp. 531, 538 (D.R.I.1978).